May it please the Court, my name is Richard Hamburger. I represent the appellant, Abcon Associates. It's our position that the same set of facts can't give rise both to a breach of contract action and a quantum Merowith claim. It's either fish or fowl. You can't have both. And in this case, Judge Wexler's finding that there was a contract and the It was a valid agreement which reflected the party's intent and it fully covered the subject matter of the agreement. There was no abrogation in the sense that anything was annulled, rescinded, appealed, or repudiated. What the client, Abcon, did after the Second Circuit's reversal in 2009 was to exercise its rights under the contract, not to abrogate the contract. And you can't say that there was any expectation of payment, contrary to what Judge Wexler found in supporting the internally inconsistent finding of quantum Merowith, because there was no expectation of payment in the event that there wasn't a recovery that was sufficient enough to pay Roslyn Savings Bank and leave money for the attorneys. The subordination This all turns on, then, the condition that your client and or your client's principal, but your client, be satisfied, right? Or that the bank have a satisfactory arrangement with the bank. There's two ways of looking at it. That way, I think what Your Honor is doing is focusing on what's the consequence of this Court's reversal. Right. And this Court's that supported those distribution orders for a particular distribution, because that distribution was no longer incapable of being implemented. So one way of looking at it is that it voided the 2007 agreement as well, defaulting the parties back to the 2005 agreement, which had a clear subordination provision, because if the 2007 agreement was a modification, the modification being voided, you go back to the 2005 agreement. The other way of looking at it is it renewed, as Judge Wexler found, the contractual right of ABCON to express its satisfaction or lack of satisfaction. And it expressed its lack of satisfaction because the debt remaining to Roslyn Savings Bank went up by $904,000. Is the satisfaction clause subject to a reasonableness standard? Is it an objective standard? I think it's an objective standard. It gives so much say to one side to the agreement. The only condition that was imposed upon it by Louis Haas was that it be exercised promptly. He gave him carte blanche, you know, in a contemporaneous email that's in the record, to tell me whether or not you're satisfied with the amount of debt remaining to Roslyn Savings Bank promptly after this Court's order reversing the priority determination. And the question that and what Judge Wexler found is that order reordered the priorities of the creditors and gave ABCON an opportunity to express satisfaction or not. In light of the overall recovery, what is the objective basis for the dissatisfaction? The debt that was—the objective basis is very clear. Under the 2002 and 2005 agreements, as Judge Wexler found, the attorney and the client made a deal that they would proceed with the case and any payments that the attorney received out of the interpleader fund, out of the monies recovered from the U.S. Postal Service, would be subordinated to repayment of the Roslyn loan because the client had put up his home and other unrelated property to get that loan, which was acquired, as the Court knows, to pay off the U.S. F&G judgment. They had put up the performance bond for this project that went south. So it's very clear that there was a subordination agreement here, and if that subordination agreement is either resurrected or still in place because you default back to it, then the client had an absolute right to say, I'm not satisfied. And if you're looking at it objectively, he wasn't satisfied because the debt went from $250,000, approximately, to $1.2 million. What was the time frame between when the first agreement was entered and our Court issued its ruling, which then caused your client to be dissatisfied? The Second Circuit Order was May 2009, and the agreement we're talking about is 2007, about two years. Two years, okay. And my point is that it doesn't matter. That's the agreement that they made. It's an agreement between an attorney and a client, and it needs to be enforced. This is a situation I don't criticize Mr. Haas. I'm not accusing him of being greedy, as the brief suggests. Sometimes lawyers find themselves in situations where they have a good case, but they don't have a client who can pay for it, and they make arrangements for it, and those are the And there were two EHA awards that he kept that were $199,000 in total. Out of the EHA awards, or out of the monies that would be recovered, there would be sufficient funds to pay off Roslyn and leave money for him. And then it became clear to him that because the interest was accumulating, that there wasn't, and he didn't get as much money, and didn't expect to get as much money out of the Postal Service as he expected, that he might not get paid anything. And for reasons which don't matter, they agreed to a distribution agreement in 2007, which gave the client the satisfaction right. And the client was paid about $900,000 altogether, $463,000 that's in dispute, plus $462,000 that's not in dispute. So even if he has to give back the $463,000, he would have been paid $462,000. That's correct. In my remaining time, I would just like to say that Is it so clear as a categorical matter that the existence of a contract as to which there has been a breach precludes quantum merit absolutely in all circumstances? There's not a case that we found to the contrary, Your Honor. Any other case that was a finding that there's both a viable contract, a breach of that contract, and quantum merit, because it's internally inconsistent. Just last month, on April 28th, in a summary order in Cole Hoover against Reddy, 217 West Law 1521459, this court decided a fairly classic quantum merit case involving attorney's fees. The client objected to paying the fee because the retainer under New York law was unenforceable because it was a mandatory minimum. And the court said that, yes, it's true, it's unenforceable according to its terms as a mandatory minimum. The agreement is unenforceable. But there was an expectation of payment, and the lawyer is going to be paid on a quantum merit basis. Here, there's no expectation of payment. That's the big mistake that Judge Wexler made, because I'm sorry, but that was a case in which payment on a quantum merit basis was allowed in spite of the existence of a contract. But the contract was voided as unenforceable under New York law, a classic abrogation situation. The court declared it void because it violated New York's rules on, again, prohibition on mandatory minimums. I certainly don't see that case as strong support for your proposition. No, just as an example, Judge LaValle, of where the quantum merit theory is more commonly applied where there's an attorney's fees issue. That's where it's applied. It's where the underlying agreement is found to be void or unenforceable for some reason. Here, this is a valid, enforceable agreement that's clear according to its terms. And the only issue, Judge Hall, is really, is there some other spin on what happened after the Second Circuit reversed? In my remaining 30 seconds, I would just say that the rest of the issues are about what has been raised to the finding of breach of contract. And in view of my time, I'll essentially rely on my brief. But I think the agreement is clear that the subordination covered both the earned hourly and the contingent, that there was no cap on the interest, that the detrimental reliance defense doesn't lie because there wasn't enough money. You can't say it's a collateral matter. APCON, whether or not APCON was technically the borrower, as Judge Wexler found, it's an irrelevancy. There was a judgment that had been assigned so that APCON was a creditor. And everyone understood the dual relationships between the parties. And I'll end by saying, on the conflict of interest point, that's really hard for the attorney to be making that argument now. The attorney understood from the very beginning, very, very beginning, that Mr. Zanobio had put up his personal assets in order to discharge that judgment that the bonding company had. And there's nothing wrong or improper in a close corporation situation of wanting to prefer one creditor over another. And the attorney was never deceived. The record is replete with understandings and admissions by Mr. Haas that Mr. Zanobio wanted that bank loan paid off before the lawyer got paid. And Mr. Haas did not have to agree to it. He could have withdrawn from the case for nonpayment of fees. He's the lawyer. He went ahead. Thank you. And you've reserved two minutes for rebuttal. Thank you, Your Honor. Mr. Strauss. Good morning. Good morning. Before I begin, can I request a minute of rebuttal on this cross-appeal? There's a cross-appeal? Yes. Yes, you may have a minute of rebuttal. Thank you. May it please the Court, I am Jeffrey Strauss, and I am here this morning to argue in behalf of Haas and Najarian that Judge Wexler's judgment be affirmed. Before I begin my argument, I'd like to respond to Judge Chin's question before. Satisfaction is to be measured by an objective standard. We briefed that at page 66 of our brief. It's an objective standard. And the debt went from $250,000 to $1.2,000, so why is that not an objective basis for being dissatisfied? We have argued that if satisfaction can be measured over a continuum so that APCON was satisfied again in 2013 when APCON's family members, Zenobio's family members, purchased the NYCB note for $850,000, staved off the foreclosure proceedings, and turned an unfriendly creditor into a friendly creditor. But still a creditor, as far as we know. Yes. Yes. But. I don't have the record reference, but there's testimony by the brother-in-law, a member of the DuBois Corporation, that he was never going to throw his sister out on the street. So yes, surely a friendly creditor. What about his brother-in-law? That's a fair question. Yeah. Many of us have them. Okay. APCON's argument that the existence of a valid and enforceable contract precludes Hassan Ejarian from recovering in Quantum Merrowood ignores the case law that Judge Wexler relied upon in paragraph 43 of his decision after trial. He pointed out there, he relied upon case law, and it's good case law, that recovery in Quantum Merrowood will be allowed even where an express contract has been rescinded, is unenforceable, or is abrogated. Here the payment provisions of the letter agreement were abrogated because of APCON's decision to express dissatisfaction at the June 30, 2009 settlement conference, and so recovery in Quantum Merrowood is not barred by the letter. Why is that an ... Go ahead, please. I was going to ... Why is that an abrogation? I mean, the contract says, you know, you've got to be satisfied, and by the terms, assuming there's an objective basis, he was not satisfied. How is that an abrogation? Because the payment provision, the parties are left without a payment provision. As Judge Wexler also pointed out in paragraph 45 of . . . The firm had agreed that its fees would be subordinate, and that seemed to be a major The subordination provisions were eliminated by the letter agreement. That was the purpose of the letter agreement. The letter agreement was . . . And where does it say that in the letter agreement? The letter agreement states that it's a modification. This letter will serve as a modification to the First Amendment to Legal Services Agreement going forward. I think there's a lack of clarity as to how the prior agreement is modified. It doesn't say it supersedes the prior agreement. Well, that's what it was all about. That's what it was all about. And if there's any need for parole testimony, we can refer to the email exchange between Lew Haas and Michael Zanobbio on July 19th, A534 in the record, where the parties' intentions are made clear with respect to the Satisfaction Clause. The argument is made that the letter agreement was voided by the Second Circuit decision, and this somehow defaulted the parties to their rights under the First Amendment. We say that's not so. The letter agreement was not before this Court when it rendered its May 7, 2009 decision, reversing the First Distribution Order. The letter agreement that modified the First Amendment by eliminating the subordination provision was not declared unenforceable by the Second Circuit decision. It wasn't partially voided by the Second Circuit decision, nor were the specific distributions rendered impossible by the Second Circuit decision. After the Second Circuit decision, APCON had a choice. It could express dissatisfaction, or it could let things be. And you're not saying it didn't express dissatisfaction. I'm saying APCON did express dissatisfaction. But they had a choice. They could have stuck with the agreement. And there's nothing about the Second Circuit decision that defaulted the parties, or somehow defaulted the parties, from the letter agreement back to the First Amendment. There's nothing about the Second Circuit decision that did away with those portions of the letter agreement that replaced the subordination provisions of the First Amendment. So what was it about the expression of dissatisfaction that undid the agreement? Let me back up. You would agree that if there's a valid contract in place, or maybe you don't, and I need to understand that, that you don't get quantum error. I understand that if there's a valid contract in place, we don't get quantum error. So your argument has to be that the contract, whatever it was, was undone and didn't exist, right? The payment provisions. Well, it's all part of one contract. Yes. So your argument has to be that the contract was undone by the expression of dissatisfaction. Yes. Instead of that expression merely being a carrying out a provision provided for under the contract. Yes. And as Judge Wexler confirmed in paragraph 45 of his order, we fill this in, we fill in the gap. Notably, the letter agreement does not indicate the amount of fees due H&N in the event there is dissatisfaction, but clearly reflects an intention to pay fees to H&N. That gap is filled in by quantum error. Similarly, I mentioned the email that was exchanged between the parties on July 19th, 2007, just as the letter agreement was being signed. That's at A534 of the record. And Mr. Haas wrote to Mr. Zanobio, the ability to terminate the agreement regarding distribution must be exercised by you in a timely manner. If you decide that NYC... if there was dissatisfaction. What the email says, if I can, I'll answer the question by... Well, I'm trying to find the basis. Are you saying there was an implied agreement that there would be resort to an hourly arrangement? Yes. And what is the basis for that? Because, just as Judge Wechsler pointed out, there's a gap in the agreement. There's no clause in the agreement that says, if you express this as... One interpretation is that there is a gap in the agreement. Another interpretation is that the agreement was that if the client was dissatisfied, the client didn't have to pay anything. That was never the party's intention. It's clear throughout the entire... I don't know that that's clear from the face of this agreement. It's clear from their decade of dealing with each other. It's clear from the trial testimony. It's clear from the first LSA. It's clear from the legal services agreement. It's clear from the First Amendment. And it's clear from the letter agreement itself that each one of these documents was prepared as a function of Hassan Najarian's efforts to collect fees from a client that was continually in arrears. Okay. Thank you. I think we have your argument, Mr. Stratton. Mr. Hamburger, you've reserved two minutes for rebuttal. Yes. I'd like to address first the issue of objective, reasonable satisfaction based upon the events subsequent. I just think it's the height of hubris. Having put the client in a situation where after 10 years of litigation and after dishonoring the agreement and refusing to return the client's money, notwithstanding this court's reversal, and having the client facing a $1.4 million mortgage foreclosure on his house, which was the whole reason they had entered into these agreements to avoid that, to have the bank paid off first. When the family comes forward and puts up real money, this wasn't a phony transaction, when the family comes forward and puts up $850,000 to buy that $1.4 million mortgage that Hassan Najarian takes the position that they should be satisfied because they got away with paying only $850,000, and it's unlikely that the sister and brother-in-law are going to be thrown on the street. Secondly, I have no quarrel with the cases that are cited by Mr. Strauss regarding quantum Merowith, but they just don't apply on the facts because here we have a situation where – The argument, as I understand it, is that assuming dissatisfaction, there was an agreement to then pivot to an hourly type arrangement on a quantum Merowith basis. Respectfully, nowhere in the record. You can't have an implied agreement to pay if there's an express agreement not to pay, and the subordination was an agreement which contemplated no payment if there weren't enough funds after paying the bank. The 2007 agreement had a satisfaction clause. If he exercised the right of dissatisfaction a day after it was signed, they would have gone back to the subordination agreement. As you pointed out, Judge Chin, there's nothing in there that says that subordination agreement is gone. It's gone if he doesn't exercise the satisfaction. But why would the client at that point in time go back to square one and say I owe you all of this money when for year after year after year, every negotiation with the attorney, every email, every letter was directed at protecting his home by having the bank paid off first? Thank you. Thank you very much. Thank you both. We'll reserve decision in this matter. Oh, I'm sorry. Excuse me. Sorry, Mr. Strauss. I apologize. You have one minute. I just wanted to go back to my reference to the July 19, 2007 email that was exchanged between Mr. Haas and Mr. Zanobbio as the letter agreement was being signed. In the very last sentence of that email, Mr. Haas writes, I'm sorry, the last two sentences. I had quoted the first sentence before, but I'll give it to you again. The ability to terminate the agreement regarding distribution must be exercised by you in a timely manner. If you decide that NYCB isn't giving you enough, you need to tell me promptly so that we can There was always an expectation of payment. One way or the other, Haas and Najarian was to be paid for the services that it rendered over the course of a decade that turned its clients' termination for default into a termination for convenience, resulted in a recovery of more than $3,400,000 that grew to more than $3,660,000, all of which was used to pay APCON's creditors and Michael Zanobbio's lender. And if they had exercised their rights under the interpleader agreement, what would have happened? Which is what you're asking us to say. That's built into this. So that's what he got. I'm not sure I understand the question. The point is . . . Going back to the sentence that you read to us . . . You mean the interpleader action? Yes. If he exercised his rights in the . . . He would have made . . . Sorry, your client exercised . . . He would have made an application before Judge Wexler to enforce an attorney's charging lien before the district court. In the interpleader? Yes. All right. Thank you. And he would have done that . . . He would have done that at a time when the fund still existed and before all the monies had been distributed. Thank you. Thank you both. Now we will reserve decision.